*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0576**

In the Matter of the Welfare of the Children of:
C. K. and J. K., Parents.

**Filed October 24, 2016
Reversed
Bjorkman, Judge**

Ramsey County District Court
File No. 62-JV-15-2854

Joanna Woolman, Colette Routel, Mitchell Hamline School of Law, St. Paul, Minnesota
(for appellants C.K. and J.K.)

John J. Choi, Ramsey County Attorney, Kathryn Eilers, Assistant County Attorney,
St. Paul, Minnesota (for respondent Ramsey County)

Jesse Sheedy, Dorsey and Whitney, Minneapolis, Minnesota (for child C.K.)

Nancy Zupfer, St. Paul, Minnesota (guardian ad litem for child C.K.)

Cheryl Toenjes, St. Paul, Minnesota (guardian ad litem for children J.K. and G.K.)

Considered and decided by Kirk, Presiding Judge; Schellhas, Judge; and Bjorkman,

Judge.

# U N P U B L I S H E D   O P I N I O N

**BJORKMAN**, Judge

Appellant-parents challenge the adjudication of their three sons as children in need

of protection or services (CHIPS).  Because clear and convincing evidence does not support

the district court's determination that the children need services that parents are unwilling or unable to provide, we reverse.

## FACTS

Mother and father adopted C.K., J.K., and G.K. in 2008. The children suffered years of abuse and neglect in their biological home, and the oldest child, C.K., was the victim of sexual abuse in a foster home. As a result, the children have a number of behavioral, mental, and physical concerns. C.K. has extensive behavioral problems. He currently suffers from reactive attachment disorder, posttraumatic stress disorder, anxiety disorder, and ADHD.

On October 19, 2015, mother called respondent Ramsey County Community Human Services Department (the county) to report that C.K. had sexually abused the youngest child, G.K. C.K. was removed from the home and placed at Arlington House, a group home. On October 26, the county filed a CHIPS petition alleging that the three children are in need of protection or services based on four grounds enumerated in Minn. Stat. § 260C.007, subd. 6 (2014). Specifically, the petition alleges the children need protection or services because (1) they had been the victims of physical or sexual abuse or resided with a victim of abuse; (2) were without necessary food, clothing, shelter, education or other required care; (3) were without proper parental care; and (4) their behavior, condition, or environment was injurious or dangerous to themselves or others. Minn. Stat. § 260C.007, subd. 6(2), (3), (8), (9).

2

During a three-day trial,[1] the district court heard testimony from various witnesses about the mental-health needs of and treatments received by both parents and the children. The district court adjudicated the children CHIPS under all four statutory grounds. Parents appeal.

**D E C I S I O N**

A district court has broad discretion when deciding juvenile-protection matters. *In re Welfare of Child of S.S.W.*, 767 N.W.2d 723, 733 (Minn. App. 2009). We review a district court's factual findings for clear error and its determination of a statutory basis for a CHIPS adjudication for abuse of discretion. *In re Welfare of Child of D.L.D.*, 865 N.W.2d 315, 321 (Minn. App. 2015), *review denied* (Minn. July 21, 2015). "A finding is clearly erroneous only if there is no reasonable evidence to support the finding or when an appellate court is left with the definite and firm conviction that a mistake occurred." *Id.* at 322 (quotation omitted). And we give considerable deference to the district court's superior position to assess the credibility of witnesses. *S.S.W.*, 767 N.W.2d at 733. Nevertheless, we perform a "close review . . . into the sufficiency of the evidence to determine whether the evidence is clear and convincing." *Id.*

To sustain a CHIPS petition, the county must establish both the existence of a statutory child-protection ground and a resulting need for protection or services. *Id.* at 728. And the county must demonstrate that the children are presently at risk and in need of services. *Id.* at 732. The district court determined that four child-protection grounds were

---

[1] The CHIPS trial took place on January 25 and 27, and March 7, 2016.

3

established and required services. The finding that the children need services is premised on the district court's determination that, absent continued involvement by the county, the children would not receive the necessary services.

Parents concede that two of the enumerated grounds exist—G.K. was a victim of sexual abuse and C.K.'s presence in the home was dangerous to his siblings—and the children require services relating to those conditions. Minn. Stat. § 260C.007, subd. 6(2)(i), (9). But the parents argue that there is not clear and convincing evidence that the children would not receive needed services absent county involvement. Rather, parents contend that the evidence shows they are willing and able to ensure that the children receive the necessary services. We agree for essentially two reasons.

First, several of the key findings of fact underlying the district court's determination that parents are unwilling or unable to provide the appropriate services are clearly erroneous. The district court found that mother opposed C.K.'s removal from the home. But the record shows that mother was the one who reported the sexual abuse to the county and knew that C.K. would be removed as a result. Sophia Thompson, the county investigator who responded to the report, testified that when she arrived at the home, parents had packed C.K.'s bag and prepared him to leave the home. Thompson indicated that parents did not contest his removal from the home in any way.

The district court's finding that parents made multiple requests to return C.K. to the home before he received a psychosexual evaluation and treatment likewise lacks record support. Mother and Thompson discussed the possibility of C.K. being returned to the home during their initial safety-planning meeting. Thompson testified that they discussed

4

the possibility because "at that point in time everything was still an option," and identified safety measures to put in place before C.K. could be returned. Thompson testified that it was understandable that mother would believe that there was a possibility C.K. could be returned to the home as a result of that conversation. Thompson later learned from her supervisor that C.K. could not return home. At that time, parents began advocating for C.K. to be placed at Mille Lacs Academy, a treatment center for young men with mental-health issues and harmful sexual behaviors. Mother explicitly testified that she did not expect C.K. to return home before he received treatment.

The district court further found that mother does not believe she needs mental-health services and that William Davis, D.O., was not providing her with psychiatric care. The record belies these findings. Mother testified that she was under a psychiatrist's care; Dr. Davis confirmed that he meets with her regularly. Dr. Davis further testified that he prescribes medication relating to mother's mental-health issues and that he believes she takes her medication regularly. Mother did indicate that her depression was in remission, but stated she monitors herself for any symptoms that would indicate regression. She acknowledged that she had not had a recent psychological assessment, but suggested she would undergo one if her psychiatrist believes it is necessary. In short, Dr. Davis is providing mother with psychiatric services, and mother acknowledges that she needs them.

The district court also made erroneous findings relating to Deena McMahon, a licensed therapist who provided counseling services to parents. The district court found that McMahon's testimony was undermined by the fact that she did not obtain collateral information about parents and solely relied on their self-reports. The record does not

support these findings.  McMahon testified that she spoke at length with Yusuf Kodar, the case manager, about the county's concerns that parents would not continue with services absent county involvement.  She testified that she did not believe parents would discontinue services and noted that parents sought her out before they were asked to and seemed dedicated to obtaining appropriate services for themselves and their children.  McMahon also testified that she had reviewed various evaluations relating to the children, including the report of C.K.'s psychosexual evaluation following the discovery of the sexual abuse. And McMahon did not change her opinion as to how the case should proceed.  During her initial testimony, McMahon testified that she did not believe a mandatory case plan was necessary.  Following cross-examination, McMahon was asked whether any of the information brought up by the county changed her opinion as to how the case should proceed; she said it did not.

Second, we are persuaded that mother's sometimes contentious behavior[2] toward the county and district court distracted from and overshadowed her demonstrated willingness and ability to meet her children's needs. The record reflects that parents have been proactive in obtaining services for their children.  When C.K. was initially placed in Arlington House, which does not provide any counseling services, parents immediately arranged for C.K. to receive therapy and rehabilitative services.  And after being told that

---

[2] The record indicates that mother exhibited aggressive and disruptive behavior on several occasions.  During the emergency protective-case hearing, mother yelled at the county supervisors and sheriff's deputies and had to be escorted from the courtroom.  She then smashed her cell phone against a wall.  Before the CHIPS trial, mother again became angry and used profane language while yelling at county supervisors.

C.K. could not return home until he received a psychosexual evaluation and treatment, parents began advocating for him to be placed at Mille Lacs Academy. The county initially opposed this placement. But Katherine Farrington, the licensed counselor who performed C.K.'s psychosexual evaluation, also recommended that C.K. enter treatment at Mille Lacs Academy. At trial, the county acknowledged that this placement was appropriate. And the juvenile-delinquency court ordered C.K. to complete inpatient treatment at Mille Lacs Academy as a condition of his probation.[3]

Parents also independently initiated counseling for J.K. and G.K. The district court recognized that all three children had started therapy, but found they were in only the initial treatment phase. The record does not bear this out. By the end of the trial (March 7, 2016), G.K. had been in treatment for three months. And there was no indication that the services he was receiving were not appropriate or adequate. While the record does not indicate precisely when J.K. started therapy, it does establish that he participated in weekly trauma-based cognitive behavioral therapy sessions and had daily cancer treatments. Notably, both guardians ad litem recommended that the CHIPS petition be dismissed. C.K.'s guardian ad litem reported that appropriate services had been set up and paid for by parents or ordered as part of the disposition in the juvenile-delinquency case. The report also notes that parents had arranged for continuing services upon C.K.'s discharge from Mille Lacs Academy. The guardian ad litem for J.K. and G.K. similarly recommended that the petition

---

[3] At trial, juvenile probation officer Ken Barber testified that C.K. would remain under the supervision of Ramsey County Probation for 180 days, with the option of extending supervision for an additional 180 days if necessary. Barber also testified that family therapy was required as part of C.K.'s probation.

be dismissed because parents had arranged for and the children were receiving appropriate treatment. Indeed, the district court did not identify any necessary services in addition to those that parents have put in place for the children.

The district court's determination that parents are unwilling or unable to provide necessary services is based largely on its finding that mother will not follow treatment recommendations with which she does not agree. This concern flows from two incidents. First, the district court found that parents did not follow the recommendations of a provider who performed a neuropsychological evaluation of C.K. in April 2014. These recommendations included, among other things, engaging C.K. in trauma-based therapy, having him undergo a psychosexual evaluation, and not permitting him to have unsupervised contact with his siblings and other younger children. Second, the district court found that mother previously ended her children's treatment with Anne Gearity, Ph.D., because she suggested mother's anxiety contributed to the children's behavior. While mother did terminate this treatment, the court's finding mischaracterizes the record. In 2012, mother asked Dr. Gearity to reevaluate J.K. because he was exhibiting strange behaviors. Dr. Gearity refused and told mother that J.K. was reacting to her anxiety. Three months later, doctors discovered a large tumor on J.K.'s brain stem. The tumor, which has since been diagnosed as terminal brain cancer, causes a variety of symptoms that affect J.K.'s behavior, including forgetfulness, slower cognitive process, and difficulties related to gross-motor functions. Under these circumstances, mother's questioning of Dr. Gearity's recommendations was not unreasonable. Moreover, mother testified that she attempted to arrange for C.K. to undergo a psychosexual evaluation as recommended in

April 2014. She contacted several providers, but they were either not taking new patients or unwilling to perform a psychosexual evaluation on an 11-year-old child without a court order. It is undisputed that J.K.'s cancer was diagnosed as terminal approximately six months after C.K.'s evaluation. Simply put, parents did not refuse to follow the recommendations concerning C.K. because they disagreed with them. They did so because their focus became J.K.'s cancer treatments.

In sum, the record does not contain clear and convincing evidence that the children are in need of services from the county. Although we appreciate the district court's concerns regarding mother's noncompliance with past treatment recommendations, the evidence does not demonstrate a current need for protective care. *See S.S.W.*, 767 N.W.2d at 732 (stating that relevant consideration in determining whether a child is in need of protection or services is whether the child is "presently at risk"); *see also In re Welfare of D.N.*, 523 N.W.2d 11, 13 (Minn. App. 1994) (noting the conditions at the time of trial and improvement of the conditions that led to the CHIPS petition are analyzed), *review denied* (Minn. Nov. 29, 2014). The paramount consideration in CHIPS proceedings is "the health, safety, and best interests of the child." Minn. Stat. § 260C.001, subd. 2(a) (2014). And the purpose of laws relating to juvenile-protection proceedings is to ensure children receive appropriate care and guidance and to preserve and strengthen family ties whenever possible. *Id.*, subd. 2(b)(1), (3) (2014). That is what was achieved here. By the time the trial ended, parents had made substantial efforts to engage all three children in appropriate counseling and other services. Because the record does not support the district court's

9

determination that the county must be involved to ensure the children receive necessary services, we reverse the CHIPS adjudication.

**Reversed.**